HOJGAARD & SCHULTZ A/S and Bruun & Sorensen A/S, Plaintiffs,

v.

TRANSAMERICAN STEAMSHIP CORP., Zodiac Marine, Inc., and M/V Regal Sky, her engines, boilers tackle, etc., Defendants.

81 Civ. 3804 (KTD).

United States District Court, S.D. New York.

July 18, 1984.

**918**

Kirlin, Campbell & Keating, New York City, for plaintiffs; William Xanttopoulos, New York City, of counsel.

Donovan, Maloof, Walsh & Kennedy, New York City, for defendant Transamerican S.S. Corp.; Richard E. Repetto, James W. Carbin, New York City, of counsel.

OPINION

KEVIN THOMAS DUFFY, District Judge.

This is an action brought under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.*, to recover for damage to a shipment of "knock down" and "stand up" or "erected" prefabricated housing units and "associated equipment," Complaint ¶ 6, that were transported from Baltimore, Maryland to Jeddah, Saudi Arabia by defendants aboard the M/V Regal Sky ("Regal. Sky"), owned by defendant Transamerican Steamship Corporation ("Transamerican") and chartered by defendant Zodiac Marine, Inc. ("Zodiac"). I held a nonjury trial on April 9 and 10, and on May 18, 1984. The following shall constitute my findings of fact.

Plaintiffs Hojgaard & Schultz A/S ("Hojgaard") and Bruun & Sorensen A/S ("Bruun") are Danish construction companies engaged in a joint venture involving the purchase and erection of a construction camp in Saudi Arabia. Danac, Inc. ("Danac"), acting as agent for plaintiffs, contracted with International Module Corporation ("IMC") for the purchase of a complete "camp" consisting of 26 erected units and 101 knock down units. The latter units were to be stacked on top of each other in groups of three during transportation to Saudi Arabia. *See* Plaintiff Exh. 2; Tr. 39 (testimony of John Lindsay).

By letter dated February 24, 1978, a booking note for plaintiffs' cargo was forwarded to Transamerican for signature. It provided in part: "4. The goods to be loaded Under deck Bills of Lading-Under Deck/On Deck" with "On Deck" crossed out. Defendants' Exh. P. However, by letter dated March 7, 1978, Stephen H. Busch of Transamerican informed the Marine Freight Company, which acted as agent for Transamerican in booking plaintiffs' cargo, that the booking note was revised "to restore clause 4 to its original form, i.e., with no deletions." *Id.* Thus, the executed booking note recited that the "goods [were] to be loaded Underdeck Bills of Lading Under Deck/On Deck." *Id.*

The booking note was then forwarded to the freight forwarder, Defendants' Exh. H, who forwarded it to Danac, Defendants' Exh. I. The president of Danac, Bent Nielsen, signed the note and returned the original to the freight forwarder and a copy to plaintiffs. *See* Defendants' Exh. J.

Pursuant to contract, on April 10, 1978, IMC delivered the cargo FOB Baltimore, Maryland where it was to be loaded aboard the Regal Sky from flatbed trucks by IMC employees. Zodiac, as charterer, operated the Regal Sky between Baltimore and Jeddah. Plaintiffs' Exh. 41 (Deposition of Bent Nielsen) at 13–14, 27–28.

Before the vessel's arrival, on April 10, 1978, Transamerican's port captain, John Lindsay, went to the pier in Baltimore where he saw the prefabricated housing that were to be loaded aboard the vessel. Tr. 38–39. At trial, Lindsay described the knock down units as "three homes laid flat, stacked in units of three ... held together by a cross frame on the ends." Tr. 39. The base of the three stacked units was a steel frame. *Id.* Captain Lindsay testified that when he arrived at the pier on April 10, 1978, he saw that "[s]ome of the knock down units had been—were listed over and weren't in good shape [and that the] frames were broken and buckled." Tr. 39.

On April 11, 1978, a survey of the knock down and erected units was performed at Pier 4 in Baltimore, Maryland. Plaintiffs' Exh. 2 at 1. The surveyors reported that IMC had supplied a device to be used by the stevedores in moving the units from the flatbed trucks to the container lot but that after moving approximately eleven units from the flatbed on the first day, March 23, 1978, the device was abandoned and two forklift trucks were utilized to lift the units. *Id.;* Plaintiffs' Exh. 41 at 54. Apparently, however, because the erected units were packed with appliances and other goods, stress was placed on the center of the units. Plaintiffs' Exh. 2 at 2; *see*

Tr. 46. The surveyors reported that approximately thirteen of the units were damaged from stevedore handling and the use of forklifts. Plaintiffs' Exh. 2 at 14.

On April 11, 1978, the vessel arrived. Lindsay testified that Bent Nielson of Danac assured him that repairs would be made on the units that were damaged. Tr. 42. Such repairs were ultimately made and plaintiffs withheld from IMC the cost of the repairs and depreciation. *See* Defendants' Exh. BB. The erected units were stowed on deck and the knock down units were stowed partially under deck and partially on deck. Plaintiff's Exh. 5 (stowage plan); Tr. 45; *see also* surveyors report, Plaintiff's Exh. 2 at 14 ("[O]f the 57 K/D and Erected Modular Units loaded, only 14 of the K/D Units went underdeck.")

In loading the units aboard the Regal Sky, the Baltimore stevedores used a spreader bar, slings and a crane. Tr. 45. Lindsay testified that the slings were annexed to the unit "a few feet from each end." Tr. 46; *see also* Tr. 131 (testimony of Ronald Gentzel). With some difficulty, loading was completed on April 13, 1978, at approximately 8:00 p.m. Tr. 47. The Baltimore surveyors noted in their report and the photographs taken by one of the surveyors disclose that some of the units were damaged during the loading process. *See* Plaintiffs' Exh. 2 at 14; Plaintiffs' Exh. 4.

As soon as the Regal Sky arrived in Jeddah on May 9, 1978, a cursory inspection was performed of the cargo on board. No photographs, however, were permitted by the Saudi officials while the cargo was in the port area. *See* Plaintiffs' Exh. 42 at 16.[1] In his deposition, Jorgen Vorsholt who in 1978 was Hojgaard's project manager in Jeddah, stated that the day after the vessel arrived in Jeddah he went on board and inspected the cargo. Plaintiffs' Exh. 42 at 10. He testified: "[w]e saw several units which had salt water, we saw several walls which had been displaced, we saw

---

1. Plaintiffs' Exh. 42 was the deposition testimony of Jorgen Vorsholt. Defendants objected to the admission of portions of Mr. Vorsholt's deposition. The deposition is admissible under Fed.R.Evid. 804(b)(1). The objected to portions of the deposition dealing with the survey report are admissible since the report was admitted into evidence.

windows which were broken." *Id.* When the units were discharged, Vorsholt stated, water poured from them. *Id.* A survey was performed at the port in Jeddah and the cargo was inspected again after it was transported to the construction site "sixty kilometers north of the discharge port." *Id.* at 13.

The discharge of the Regal Sky was performed by stevedores at Jeddah Port known as Phelsinports from the Phillipines. Plaintiffs' Exh. 17 at 3.[2] The stevedores in Jeddah attempted to discharge the cargo by using the vessel's center crane; after abandoning the use of the crane, the stevedores used IMC's spreader. *Id.* Apparently, because the stevedores had difficulty balancing the erected units, the discharge was time consuming. *Id.* at 4. Once the first unit was placed on the trailer, the surveyor noticed that a panel was dented, flashing was ripped and torn and the roof was bent. *Id.* The surveyor concluded that the "damage was relatively superficial but evidently caused by the chains linking the slings to the spreader." *Id.* The survey report notes also that the sides of several containers had been "stoved in" as a result of wave damage during the voyage. *Id.* *See also* Plaintiffs' Exhs. 14, 15 (photographs).[3] Thus, it is apparent to me that much of the damage—especially the water damage, ripped flashing and the stoving in of the sides of units—resulted from exposure to rough weather conditions because they were transported on deck rather than below deck. There is no doubt, however, that some of the damage to the units was caused by the stevedores in Jeddah.

The survey report also stated that the knock down units were missing side panels and had been damaged by salt water. Plaintiffs' Exh. 17 at 8. The surveyor noted that the "fibreglass insulation material" was "saturated." *Id;* Plaintiffs' Exh. 16, at 3–4.[4] The knock down units transported below deck had no water damage but instead were damaged slightly during discharge. *Id.* Finally, the stevedores in Jeddah dropped a kitchen unit which was regarded by the surveyors as a constructive total loss. Plaintiffs' Exh. 17 at 7. The survey stated that because Jeddah regulations do not permit the offloading of damaged cargo, the kitchen unit was loaded back on the Regal Sky. *Id.*

Thereafter, plaintiffs notified IMC by letter of its dissatisfaction with the packaging of plaintiffs' cargo. *See* Defendants' Exhs. U, Y. Plaintiffs withheld payment of $22,-111.09 due IMC, *see* Defendants' Exh. BB, and withheld $12,000.00 from the amount of freight due Transamerican, *see* Defendants' Exh. O. Plaintiffs had the damaged units repaired and obtained a substitute camp pending the completion of repairs on the IMC units. *See* Plaintiffs' Exhs. 42 at 26–37, 44–45.

On June 19, 1981, plaintiffs commenced this admiralty action against Transamerican, Zodiac, and the vessel seeking $200,-000.00 in damages.

## DISCUSSION

### I.

COGSA provides that "[t]he carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). The carrier may escape liability for breaching the above duty if plaintiffs' cargo is not within COGSA's definition of "goods."

"Goods" are defined as "goods, wares ... except ... cargo which by the contract of carriage is stated as being carried on deck and is so carried." 46 U.S.C. § 1301(c). Thus, if the contract of carriage

---

**2.** Plaintiffs' Exh. 17 is the report of the survey performed in Saudi Arabia. It is admissible under Fed.R.Evid. 804(b)(1).

**3.** Plaintiffs' Exhs. 14 and 15 are photographs taken in Jeddah. They were objected to as having no foundation. Since the foundation is set forth in the deposition of Vorsholt which I have ruled admitted into evidence, defendants' objections are moot.

**4.** Plaintiffs' Exh. 16 is the second survey report performed by Gallatly Hankey Marine Services. It is admissible under Fed.R.Evid. 804(b)(1).

is construed to provide for on deck shipment, defendants have no liability under COGSA.

■ Plaintiffs claim that there was an express agreement between the parties to ship plaintiffs' cargo under deck. However, Transamerican signed a booking note that contained a clause stating that the goods were to be loaded "Underdeck Bills of Lading Under Deck/On Deck" after refusing to sign a booking note with the words "On Deck" crossed out. *See* Defendants' Exh. P. Nevertheless, though there was no express agreement, plaintiffs had a right to under deck stowage. The booking note contained the typed words "under deck bill of lading" immediately preceding the printed term "Under Deck/On Deck." Plaintiffs' Exh. 30. The bill of lading issued by Transamerican was "clean" except that it was stamped "received for shipment." Plaintiffs' Exh. 1. A clean bill of lading that does not specify on deck shipment is legitimately understood by the shipper as "importing under deck stowage." *See Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 15 (2d Cir.1969) (express agreement to ship *on deck* is required), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

My finding that plaintiffs reasonably believed that they had contracted for and would receive under deck stowage, *see* Plaintiffs' Exh. 41, at 86–87, is not impaired by the fact that plaintiffs' agent, Bent Nielsen, was aware when he arrived at the Baltimore terminal on April 11, 1978, that a *few* units would have to be shipped on deck. *See* Defendants' Exhs. S, V. As it turned out, all but fourteen of the knock down units were stowed on deck. *See* Plaintiffs' Exh. 2 at 14. I note also that had such an option been understood by plaintiffs to be part of the contract, its contract with IMC as it related to packaging would have been likely to contain specifications for on deck stowage. Furthermore, it does not appear that additional insurance coverage was obtained to provide for the extra risk incurred by on deck stowage. *See* Plaintiffs' Exh. 46 at 3 (testimony of Finn Hjalsted pursuant to Hague Request); Plaintiffs' Exh. 32.

■ Even assuming defendants effectively retained an option to stow on deck by its form booking notice, plaintiffs' cargo is still within COGSA's definition of goods. In order to take the plaintiffs' cargo out of COGSA's definition of goods, it is insufficient for the bill of lading to state that the carrier has an *option* to stow on deck; the bill of lading did not state "that the cargo *is being carried on deck." Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d at 15–16. Thus, I find that there was no express agreement between the parties for an on deck stowage option.

Furthermore, the Supreme Court has held that the bill of lading governs where cargo is to be stowed and the terms of a separate freight agreement such as the booking note in this case has no qualifying effect. *See St. Johns N.F. Corp. v. Companhia Geral*, 263 U.S. 119, 123–24, 44 S.Ct. 30, 30–31, 68 L.Ed. 201 (1923). Thus, I find that plaintiffs' cargo is within COGSA's definition of "goods"; therefore, the duties in the 46 U.S.C. § 1303(2) apply to defendants.

## II.

■ To recover under section 3 of COGSA, 46 U.S.C. § 1303, the cargo shipper must show that the "goods were damaged while in the carrier's custody." *Caemint Food v. Lloyd Brasileiro*, 647 F.2d 347, 351 (2d Cir.1981). Plaintiff can establish that the goods were damaged while in the carrier's custody by showing that the goods were delivered to the carrier in good condition but were discharged in damaged condition. *Id.* A "clean" bill of lading is *prima facie* evidence that the cargo was delivered in good condition. 46 U.S.C. § 1303(4); *Caemint Food v. Lloyd Braseleiro*, 647 F.2d at 351.

■ A clean "received for shipment" bill of lading was issued by Transamerican through its agent, Ramsay, Scarlett & Company on April 13, 1978. Thus, the

issuance of a clean bill of lading constitutes *prima facie* evidence that plaintiffs' cargo was in good condition in Baltimore on April 13, 1978. Furthermore, as I have already noted, prior to the time that the units were loaded aboard the Regal Sky, a survey was performed after several units were observed by Transamerican's port captain to be damaged. The units that were damaged between IMC's facility and the Baltimore terminal were repaired by April 13, 1978. *See* Tr. 42; Plaintiffs' Exh. 2 at 2.

 Although several units were damaged by the Baltimore stevedores in the process of loading the vessel, under COGSA the carrier has a non-delegable duty to properly and carefully load and stow plaintiffs' cargo. *See Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 330 (2d Cir.1972); *Miller Yacht Sales, Inc. v. M.V. Vishva Shobha*, 494 F.Supp. 1005, 1013–14 (S.D.N.Y.1980). The carrier has a right of indemnification against the stevedores. *Id.* In addition, a comparison of the findings contained in the outbound survey with the findings of the outturn survey and repair specification sheet, *see* Plaintiffs' Exhs. 17, 18, indicates that the damage resulting from stevedore handling in Baltimore was far more minimal and of a different nature than the damage evident upon arrival in Jeddah. For example, the water damage and the "stoved-in" sides of the erected units were obviously not the result of stevedore handling. For these reasons, I conclude that plaintiffs have sustained their burden of proof in establishing that their cargo was in good condition when Transamerican received it for shipment.

As to the condition of the cargo at outturn in Jeddah, from the facts that I have already recited, it is clear that many of the knock down and erected units were damaged upon delivery to the flatbed trucks that were used to transport the goods to the construction camp. Accordingly, I find that plaintiffs have established that their cargo was damaged while in the custody of Transamerican.

### III.

Defendants argue that they are not responsible for the damage to plaintiffs' cargo because it resulted from "insufficiency of packing." 46 U.S.C. § 1304(2)(n). The contract between IMC and plaintiffs called for "[p]acking as provided for in IMC charges is seaworthy as normal commercial practice for items of the types supplies." Plaintiffs' Exh. 11. In support of their contention that plaintiffs' cargo was inadequately packaged for a transoceanic crossing, defendants refer to the letters of complaint to IMC from plaintiffs. *See* Defendants' Exhs. U, X, Y. In addition, defendants rely on the fact that after plaintiffs discovered that several of the units were damaged en route to the Baltimore terminal, plaintiffs retained Captain Heiner Popp and the Baltimore Cargo Surveyors to inspect the packing of the cargo.

 Defendants argument is unpersuasive for several reasons. First, plaintiffs' expression of dissatisfaction to IMC after discovering prior to the vessel's arrival in Baltimore that several units were damaged does not constitute an admission on plaintiffs' part that the packing was insufficient. In fact, it appears that plaintiffs' primary complaint to IMC was its failure to inform adequately the stevedores of the most effective and safe way to move the units rather than the packaging of the units. *See* Defendants' Exh. U. Likewise, the retention of surveyors for the purpose of documenting their observation of damage does not constitute a waiver by plaintiffs of any claim they may have had against defendants. It was in plaintiffs' best interest to explore all possible sources of liability. Indeed, shortly after notifying IMC that they held IMC liable for the damage to their cargo, plaintiffs confirmed by letter dated June 23, 1983, an earlier letter and telephone conversation with Transamerican in which plaintiffs indicated that it held Transamerican "responsible for the damages to the cargo from the time you commenced loading in Baltimore and until it had been unloaded at the Port of Jeddah." Defendants' Exh. W.

Second, from the surveyors reports, Popp's deposition *de bene esse*, and the expert testimony of Bruce Maxwell and Ronald Gentzel, I conclude that plaintiffs' cargo was adequately packed for under deck shipment. Defendants' expert, Bruce Maxwell, testified that in his opinion the cargo was not packed adequately for oceangoing shipment. "The beams that were utilized in the buildings were not of sufficient capacity to carry the loads that were going to be imposed on the buildings." Tr. 91. Much of the remaining testimony by Maxwell related to the use of a superficial wall instead of a structural wall on the open side of the erected units. Tr. 92–93. Maxwell conceded, however, that a container—and here, by analogy, an erected unit—should be stowed below deck if it is missing such a structural wall. Tr. 104.

Gentzel, on the other hand, persuasively and credibly testified at trial that the units were "adequately packaged and adequately designed to be stowed below deck." Tr. 125. He testified that the erected units were not packed properly for on deck stowage; the windows should have been covered, the joints should have been caulked, "plywood wrap should have been applied to six sides of a given module," and the modular unit should have been totally wrapped in plastic. Tr. 134. Furthermore, Gentzel indicated that even with the above-mentioned protective measures the units would be vulnerable because they would be unable to withstand the impact of waves hitting them. Tr. 135 (water weighs approximately eight pounds to a gallon and a small wave is about 1,000 gallons). Overall Mr. Gentzel's testimony was more complete and credible than Mr. Maxwell's testimony which at times became argumentative and adversarial.[5] I find that Mr. Gentzel's opinions had a sound evidentiary basis. Thus, I conclude that defendants cannot award liability on the basis of insufficiency of packing.

## IV.

Defendants also seek to escape liability under 46 U.S.C. § 1304(2)(q) which provides that the carrier and the ship shall not be responsible for damage resulting from "[a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier." Defendants assert that the damage to the units was occasioned by stevedores in Saudi Arabia over whom they had no control.

Under this exception the burden of proof is on defendants to show that they did not *"contribut[e]* to the loss or damage." *Id.* (emphasis supplied). Defendants have not come close to proving that *neither they nor their agents* "contributed" to the damage to the units. Certainly, plaintiffs' cargo was damaged by water saturation while en route and not by the stevedores in Jeddah. Moreover, as I have already stated, defendants' responsibility of *loading* and *discharge* of the cargo is not delegable. Thus, the damage to plaintiffs' cargo sustained during the stevedores' loading in Baltimore and discharge in Jeddah is Transamerican's responsibility.

It is true that a carrier may be released from its responsibility of discharging and delivering plaintiffs' cargo if the custom and usage of the port is such that all control is taken from the carrier. *See Farrell Lines, Inc. v. Highlands Insurance Co.*, 532 F.Supp. 77, 80 (S.D.N.Y.) (citation omitted), *aff'd*, 696 F.2d 28 (2d Cir.1982). Yet, defendants have not established that they had no control over the discharge operations and the port log indicates in fact that defendants played an active role in the discharge. *See* Defendants' Exh. KK. Furthermore, although defendants introduced no evidence of Saudi Arabian port regulations, Judge Sofaer, in a recent opinion, sets forth the regulations

---

**5.** So-called "experts" who waste time arguing the case as if they were retained counsel are generally entitled to little credibility. In misconceiving their function such experts expose a bias toward the side by which they are retained. This colors their testimony to such a degree that it is *not* an aid to the finder of fact—it is an attempt to displace the fact finder.

thoroughly. *See Binladen BSB Landscaping v. M.V. Nedlloyd "Rotterdam,"* 83 Civ. 1037 (S.D.N.Y. June 25, 1984). I will not repeat Judge Sofaer's findings except to note that "[w]hile the Saudi port regulations reserve control to Saudi Authorities over the handling and discharge of goods, those rules fail to establish that the Port Authorities act in behalf of the consignee rather than the carrier." *Id.* at 6.

### V.

Defendants argue that plaintiffs have failed to sustain their burden of proving damages because it is impossible to "differentiate" the damage that occurred while the cargo was in defendants' custody from the damage occasioned by the stevedores in Jeddah and by the plaintiffs' truckers who transported the units to the campsite and from the fire that occurred when knock down units were separated by a cutting torch. *See* Defendants' Posttrial Memorandum at 11; Plaintiffs' Exhs. 17 at 3, 42 at 13–14, 49–50, 59, 66, 70.

I have already held that defendants are responsible for the damage caused by the stevedores in Jeddah. With respect to the trucking damage, the surveyors noted that the "damage, if any, caused during road transportation was very minor." Plaintiffs' Exh. 16, at 4. There is no evidence to the contrary. The surveyors noted that in the process of separating knock down units, the "molten metal [which was] created by the cutting torch came into contact with the interior of unit 33–139KD." Plaintiffs' Exh. 16 at 4. Moderate internal fire damage was noted. *Id.* The cost of repairing the unit damaged by fire was not included by plaintiffs in their list of damages. *See* Plaintiffs' Exh. 42 at 58.

■ Defendants argue also that the surveyors noted damage to the doors and locks that was the result of Jeddah customs' officials forcing the doors open. Plaintiffs' have not claimed damages for replacing the locks and repairing the doors. Accordingly, plaintiffs' proof of its damages is sufficient to impose liability on defendants.

### VI.

■ Finally, defendants assert that under 46 U.S.C. § 1304(5) their liability is limited to $500.00 per package or "in case of goods not shipped in packages, per customary freight unit." Thus, defendants argue, their total liability is $29,000.00 (58 packages × 500.00). It is well-established that defendants cannot claim the benefit of COGSA's limitation of liability if the carrier committed any unreasonable deviation from the contract of carriage. *See General Electric Co. International Sales Division v. S.S. Nancy Lykes,* 706 F.2d 80, 87 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). The issue then is whether stowing plaintiffs' cargo on deck was a "deviation which unjustifiably expose[d the] cargo to unanticipated risk." *Id.* I have already held, in the context of whether plaintiffs' cargo is within COGSA's definition of "goods," that plaintiffs were entitled to expect under deck shipment because the bill of lading that was issued by Transamerican was "clean" and did not provide for on deck shipment. Such a substantial increase in risk exposure constitutes an unreasonable deviation. *See St. Johns N.F. Shipping Corp.,* 263 U.S. at 124, 44 S.Ct. at 31 (although the freight agreement provided for "on or under deck [stowage] ship's option," clean bill of lading was issued; thus, vessel was liable for a deviation of the contract).

Furthermore, defendants attempted unsuccessfully to show that it was customary to stow knock down and erected units on deck. *See Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d at 19. Both experts indicated that in their experience, from 50 percent to 60 percent of the modular units that they observed and supervised being stowed were stowed under deck. *See* Defendants' Exh. QQ at 37; Tr. 134. Indeed, Mr. Gentzel indicated that plaintiffs' cargo had not been prepared for on deck shipment as had other cargo that he observed being shipped on deck. *See* Tr. 134. Thus, the testimony of the parties' experts indicates that there is no

generally recognized method of stowing modular units. Thus, the carrier is liable for the full amount of plaintiffs' damages without the benefit of the $500.00 per package limitation.

## VII.

Plaintiffs seek to recover damages to compensate them for (1) the cost of repair materials and labor, (2) depreciation, (3) the employment of a substitute camp, (4) the value of the kitchen unit that fell to the quay in Jeddah, and (5) prejudgment interest computed from the May 12, 1978 date of delivery. I address each element of plaintiffs' claimed damages *seriatim.*

### A. Repair

Plaintiffs may recover the "reasonable and necessary costs for repairing or reconditioning the damaged cargo where such costs were less than the diminution in market value sustained and did not exceed the value of the cargo prior to injury." *Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y.1970) (citations omitted). After considering all of the evidence of damage, I find that plaintiffs' claim of approximately $78,000.00 in repair costs is clearly less than the diminution in the market value of the damaged units. Furthermore, it does not exceed the value of the cargo prior to injury. *See* Plaintiffs' Exh. 11 at 4.

Plaintiffs submitted voluminous documentation of the amounts incurred in purchasing repair materials and employing labor. *See* Plaintiffs' Exhs. 19, 20, 21, 23, 24. Many of the amounts are listed in either Danish krona or Saudi Arabian riyals. Plaintiffs' damages, of course, will be in dollars. The exchange rate at the time that the plaintiffs incurred the expenses is ascertainable and appears to be the exchange rate used by plaintiffs in their correspondence to Transamerican. *See* Defendants' Exh. GG. Accordingly, plaintiffs are directed to submit documentation of the exchange rate between riyals and krona, krona and dollars, and riyals and dollars when submitting the proposed judgment.

### B. Depreciation

Plaintiffs seek two percent depreciation or loss of resale value ($24,-745.72). *See* Plaintiffs' Exh. 28. Under COGSA, plaintiffs can recover only a sum that will make them whole, and cannot be awarded a profit. *See* 46 U.S.C. § 1304(5); *Hector Martinez and Co. v. Southern Pacific Transportation Co.,* 606 F.2d 106, 108, *reh'g denied,* 609 F.2d 1008 (5th Cir. 1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). Because plaintiffs' cargo was not shipped to Jeddah to be resold, and because plaintiffs have already been awarded their repair costs in lieu of the diminution in market value, plaintiffs' request for depreciation is denied.

### C. Substitute Camp and Kitchen Unit

Plaintiffs are entitled to recover the amount spent in employing a substitute camp because it is an expense that should have been "forseeable by the carrier" and is the "proximate and usual consequence of the carrier's action." *Hector Martinez and Co.,* 606 F.2d at 109 (citation omitted).

In the case of the kitchen unit which was a total loss, the measure of damages is the fair market value (at the point of destination) of the unit in its condition when defendants took control of it in Baltimore, less any salvage. *See Encyclopaedia Britannica, Inc.,* 422 F.2d at 18. Because there is no evidence in the record to indicate that the value of the unit is different from that listed on the invoice, the invoice is sufficient to establish the value of the unit. *See Emmco Insurance Co. v. Wallenius Caribbean Line, S.A.,* 492 F.2d 508, 514 (5th Cir.1974); Plaintiffs' Exh. 12 (invoice). Plaintiffs may therefore recover the value of the unit as listed in the invoice.

### D. Prejudgment Interest

Finally, plaintiffs are entitled to prejudgment interest to run from the date of delivery. *See Mitsui & Co., Ltd. v.*

*American Export Lines,* 636 F.2d 807, 823 (2d Cir.1981). Prejudgment interest shall be computed at a rate of nine percent. Plaintiffs shall submit a judgment within ten (10) days of the date of this decision on five (5) days' notice.

SO ORDERED.