694

ETS GUSTAVE BRUNET, S.A., Plaintiff,

v.

M.V. "NEDLLOYD ROSARIO," M.V. "Nedlloyd Rouen," M.V. "Strathconon," their engines, boiler, etc.

v.

The AUSTRALIA JAPAN CONTAINER LINE LTD., Nedlloyd Lijnen B.V., New York Express, Associated Rigging and Hauling Corp. and Goth Transport Inc., Defendants,

v.

NEW YORK EXPRESS, Third–Party Defendant.

No. 87 Civ. 7296 (DNE) (SEG).

United States District Court,
S.D. New York.

April 15, 1996.

Cone & Associates by John E. Cone, Jr., Rye, New York, for Plaintiff.

Kirlin, Campbell & Keating by J. Scot Provan, Laurence E. Curran, III, New York City, for Defendants Australia Japan Container Line Ltd. and Nedlloyd Lijnen B.V.

Stuart P. Schlem, Manalapan, New Jersey, for Defendant Associated Rigging & Hauling Corp.

Morgan, Lewis & Bockius by Joseph P. Cyr, New York City, for Defendant Goth Transport, Inc.

Harold H. Seikel, Garden City South, New York, for Defendant and Third–Party Defendant New York Express.

## OPINION

GRUBIN, United States Magistrate Judge:

This is an action brought under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 *et seq.*, by ETS Gustave Brunet S.A., a French corporation engaged in the lace-making business, to recover $533,969 for damage to lace machines transported by ocean carrier defendant Nedlloyd Lijnen B.V. ("Nedlloyd") from Port Jefferson, New York to Calais, France. Plaintiff alleges the damage was caused by the fact that the machines were carried on deck on the three ships, the Nedlloyd Rosario, the Nedlloyd Rouen and the Strathconon.[1] Plaintiff also sues New York Express, an air freight forwarder it hired to arrange the shipment; Goth Transport, Inc. ("Goth"), an ocean freight forwarder hired by New York Express to find and engage an ocean carrier for the transportation of the machines; and Associated Rigging & Hauling Corp. ("Associated"), hired by New York Express to load and secure the machines in the containers furnished by Nedlloyd. Plaintiff has alleged against Nedlloyd and New York Express breach of the bills of lading for delivery in the damaged condition; against Nedlloyd and Goth, breach of contract to stow under deck; against New York Express and Goth, breach of agreement to provide freight forwarding services for under deck transport and negligence; and against Nedlloyd and Associated, breach of contract in not properly preparing and packaging the cargo, negligence, breach of contract of bailment and breach of implied warranty. Defendant Ned-

---

1. Plaintiff also names Australia Japan Container Line, Ltd. ("Australia Japan") as a defendant. Nedlloyd was the owner of the Nedlloyd Rosario and the Nedlloyd Rouen. Nedlloyd chartered the Strathconon from Australia Japan.

lloyd asserts cross-claims against New York Express, Associated and Goth for indemnity if it is found liable, claiming breach of contract, negligence and breach of warranty of workmanlike conduct and services. Defendants Associated and Goth assert cross-claims against each other and against Nedlloyd and New York Express for indemnity if found liable, claiming breach of contract, negligence and breach of warranty, and Associated also asserts cross-claims against Nedlloyd and Goth for indemnity if it is found liable, claiming fraud. The case was tried before me in 17 days of testimony.

## BACKGROUND

Plaintiff is a manufacturer of high-quality design lace in Calais, an area that has become a worldwide center for the manufacture of design laces. Most of the machines used by plaintiff to make its lace are a type that use a particular loom process known as Leavers and were manufactured by a company named Jardine France ("Jardine") in Nottingham, England until the early 1960s. Since then, the only new Leavers lace machines manufactured in the world have been manufactured by Spowage, Humphreys & Wyer, also of Nottingham. Having built a new plant in 1986 to expand its business, plaintiff wanted to buy additional Leavers machines which were of a 9½ and 10½ "point" size, to make lace out of Lycra. Most of the machines it already had were 12 and 14 point ones, and while 12 point machines could apparently be adapted to make Lycra lace, 14 point ones could not. Plaintiff sought machines that would all be of a similar manufacture so that, in the event repairs were needed on a machine during a job, parts would be interchangeable, allowing plaintiff to continue the work on another machine. Upon learning that Thomas Wilson & Sons, an American lace manufacturer in Port Jefferson, New York, had filed for bankruptcy, plaintiff's general manager Willie Convie visited the Wilson plant on June 6, 1986. Wilson had twenty to twenty-five Leavers machines available for sale, and Convie intended to purchase up to ten. During this trip Convie spoke with Wilson's president and agreed upon a purchase price for ten machines, comprised of two 9½ point Jardine machines and all eight of the 10½ point Jardine machines at this Wilson facility. Convie returned to Wilson's plant on July 11 with plaintiff's foreman who examined the machines and found them to be in good condition. As a result, plaintiff purchased the ten machines, paying $22,000 for each of five of the machines (which were missing "bottom bars") and $30,000 for each of the others. By Wilson-designated numbers, the machines sold to plaintiff were: 9, 13, 14, 15, 16, 17, 18, 19, 22 and 26.

Plaintiff had no prior experience with transportation of such machines by sea. Convie spoke with John Van der Riet of Expedex B.V., an air freight company owned by the Dutch holding company that also owned plaintiff, and Van der Riet told Convie that Expedex also had no experience with transporting sea cargo and that he would contact a New York freight forwarder for assistance. Van der Riet then asked New York Express, itself an air freight forwarder with no sea cargo experience, to arrange for transportation of the ten machines from Port Jefferson to Calais. Wolfgang Reichel, the principal of New York Express, was given the dimensions of the machines—each weighs approximately 39,800 pounds and is approximately 7.1 meters long, 2.3 meters wide and 3 meters high—and Reichel contacted Goth, an international ocean freight forwarder, to arrange for the ocean transportation. To secure freight rates, Goth employee Hans Peter Betschart contacted Nedlloyd and another company, Polish Ocean Lines. Nedlloyd had begun a new service employing "ro-ro" vessels, which featured large ramps for rolling large cargo on and off below decks. Reichel's initial communications with Van der Riet and Betschart anticipated that the machines would simply be placed on flatbed trailers or on platforms known as mafis and wheeled into the ro-ro vessels for below deck stowage. It was subsequently determined that, although the machines were too high to fit in fully enclosed containers, they could nevertheless be placed in open-top containers, i.e., metal containers with floors and sides but no roofs.

It is not disputed that Van der Riet told Reichel to obtain under deck stowage. Tr.

932–36.[2] Reichel maintains that he conveyed this instruction to Betschart, but Betschart denies that he received any such instruction from Reichel. Betschart admits that he never requested below deck stowage from Nedlloyd, although he testified that, during his negotiations with Nedlloyd salesperson Randy Clayton for shipment of the machines on Nedlloyd's ro-ro vessels in open-top containers furnished by Nedlloyd, Clayton stated that the machines would be stowed below deck. Indeed, the very point of a ro-ro vessel was to facilitate loading large cargo under deck, as Betschart testified was his understanding at the time. Clayton does not recall making such an express statement, although he does say it was his understanding at that time that the machines would be stowed below deck because it would have been "absolutely asinine" and "negligent at best" to put them on deck. Clayton ultimately provided Betschart with a freight rate which covered both the ocean transportation of the ten machines as well as their inland truck transportation from Port Jefferson to the New York pier and from the Le Havre pier to Calais. Betschart was told that the ten containers would be carried on three ro-ro vessels operated by Nedlloyd, the Nedlloyd Rotterdam, the Nedlloyd Rosario and the Nedlloyd Rouen.

New York Express retained the services also of Associated to place each machine in a container and to secure the individual tarpaulin supplied with the container by Nedlloyd over the top of the container after Associated rigged the machine inside. Convie hired Chris Chambers, Wilson's designer, to help in preparing the ten machines for transport. Chambers wiped down the parts of each machine with oil, placed plastic over the "comb bars" and "working bars" of each machine, placed wood beams over the top of each machine to keep it from rubbing against the tarpaulin, and separately packed the bobbins and carriages in individual boxes after wrapping them in oiled paper and placing plastic over them. After loading, blocking and bracing each machine (with its box of bobbins and carriages) in a container, Associated affixed a tarpaulin to each container by running a wire cord through eyelets in the tarpaulin to grommets which were on the sides of the container near the top and over the doors at the rear of the container. Because each machine was one-and-one-half to two feet overheight, it was not possible to use every eyelet and grommet to cover each container completely, and there were visible gaps between each tarpaulin and the back side of the container.

The first five containers trucked to the pier were loaded on September 29, 1986 onto the Strathconon, a container, not ro-ro vessel chartered by Nedlloyd from Australia Japan. Machines 13, 14, 15 and 16 were stowed below deck; machine 17 was stowed on deck, surrounded on three sides by an upper tier of other containers and in front by the house of the vessel. The next three containers to arrive at the pier, with machines 18, 19 and 22, were stowed on deck the ro-ro Nedlloyd Rosario on October 8. These containers were stowed in the middle of the deck with only one side of them having an upper tier of other containers stacked nearby. The last two containers to arrive at the pier, with machines 9 and 26, were stowed on deck the ro-ro Nedlloyd Rouen on October 20 with an upper tier of other containers near one side and two upper tiers near a second side. The bills of lading for each shipment contained no notation that any of the containers were being carried on deck, although each included a form clause giving Nedlloyd an option of stowing the cargo on deck.[3]

**2.** "Tr. __" refers to the transcript of trial, and "Ex. __" will refer to exhibits admitted at trial.

**3.** Clause 15 of the bills of lading stated:

15. OPTIONAL STOWAGE AND DECK CARGO

(1) The Goods may be packed by the Carrier in Containers.

(2) Goods, whether or not packed in Containers, may be carried on deck or under deck without notice to the Merchant. All such Goods (other than live animals), whether carried on deck or under deck, shall participate in general average and shall be deemed to be within the definition of goods for the purposes of the Hague Rules and shall be carried subject to these Rules.

(3) Notwithstanding Clause 15(2), in the case of Goods which are stated on the face hereof as being carried on deck and which are so carried, the Hague Rules shall not apply and the Carrier shall be under no

The Strathconon arrived in Le Havre on October 13, and the five containers it carried were delivered to warehouses in Calais on October 17 and 20. Machine 13 (which had been carried below deck) arrived in Calais with the shifting arm of the front spindle of the machine broken, but the tarpaulin was intact. There was a meter-long tear on the tarpaulin on the container with machine 16 (also carried below deck) and apparently some rust on part of the jacquard (the loom mechanism that causes threads to be lifted in the proper succession for producing a programmed design) directly under the tear. The tarpaulin on the container with machine 17 (carried on deck) sustained three holes, and there were traces of oxidation on the jacquard below those holes. The two other machines (stowed below deck) apparently sustained no damage. The Rosario arrived in Le Havre on October 20 and the three containers it carried on deck were delivered to Calais on October 24. The tarpaulin on each was badly ripped and the machines had sustained extensive corrosion damage. Plaintiff notified Nedlloyd of the damage, and on October 24 a joint survey was conducted of the eight machines carried on the Strathconon and Rosario by Jean–Francois Rivenet, a Calais surveyor retained by plaintiff; Rene Galleman, a cargo and marine surveyor retained by Nedlloyd's insurer; Daniel Lecoeur, a representative of Jardine–France S.A. of Calais, now a lace machine repair company; Frans Van Bellen, retained by plaintiff's cargo underwriter; plaintiff's general manager Willie Convie and another employee of plaintiff. The Rouen arrived in Le Havre on November 3. A large portion of the tarpaulin on the container with machine 9 had been ripped loose, and the machine had also sustained corrosion as a result. The tarpaulin on the container with machine 26 had not been damaged and that machine arrived in good condition. Marcel Caraboeuf, representing Nedlloyd's insurer, conducted a survey of the two machines that same day at Le Havre.

The surveyors conducted extensive tests on all the machines for which plaintiff seeks damages and the water found in the containers and concluded that the corrosion by rust and the oxidation pitting that had occurred was a direct result of exposure of the machines' carbon steel to salt water. They also found that the carriages and bobbins that had been separately packed had also been exposed to considerable salt water with concomitant corrosion and pitting to the carriages. During their investigation through January 1987 the surveyors considered obtaining new or reconditioned machines from Spowage, Humphreys & Wyer. The surveyors rejected that option as too expensive, and received an estimate for repairs from Lecoeur of Jardine. At a meeting on January 22, 1987, all of the surveyors discussed the damage that had been sustained and agreed to a final cost of repairs and manufacture of necessary replacement parts to be undertaken by Jardine. They agreed that repairs should begin quickly to stop the corrosive effects of the salt water. Plaintiff explained to the surveyors that extensive work on machines 18, 19 and 9 was required because, due to the intricacy of the machines, the replacement of some parts that were heavily pitted and corroded required that other parts working in unison with them also be replaced. Pursuant to the surveyors' agreement, plaintiff paid Jardine 1,867,357.93 fr. (the equivalent of $325,551 at undisputed exchange rates) for repairs and replacements, almost all of which, according to Lecoeur, related to corrosion (with only a small percentage to mechanical damage). These repairs had been completed by the time of trial. In addition, plaintiff contracted with Jardine to manufacture 2,800 replacement carriages, which had not yet been undertaken by the time of trial. The anticipated cost of the new carriages is 1,195,488 fr. ($208,418). Based on these sums, plaintiff seeks to recover $533,969 in damages.

## DISCUSSION

I. *NEDLLOYD IS LIABLE TO PLAINTIFF FOR DAMAGE TO ITS CARGO UNDER COGSA*

 A. *Plaintiff Established a Prima Facie Case*

 ■ To hold Nedlloyd liable for damage to its cargo under COGSA, plaintiff has the

---

liability whatsoever for loss, damage or de-

lay, howsoever arising.

initial burden of establishing a prima facie case by showing that the cargo was delivered in good condition to the carrier's custody but discharged in bad condition. *Raphaely Int'l, Inc. v. Waterman S.S. Corp.,* 972 F.2d 498, 501 (2d Cir.1992), *cert. denied,* 507 U.S. 916, 113 S.Ct. 1271, 122 L.Ed.2d 666 (1993); *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982); *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 353 n. 5 (2d Cir.1981); *Ferrostaal Corp. v. M.V. Singa Wilguard,* 838 F.Supp. 757, 767 (S.D.N.Y. 1993). Although bills of lading containing no notations of damage, such as those issued by Nedlloyd in this case, ordinarily establish a presumption of the good condition of cargo at loading, *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d at 32; *Ferrostaal Corp. v. M.V. Singa Wilguard,* 838 F.Supp. at 768, where the condition is not apparent from examination of its container, it is arguable that such a presumption should not be drawn. *See Caemint Food, Inc. v. Brasileiro,* 647 F.2d at 353–54; *David R. Webb Co. v. M/V Henrique Leal,* 733 F.Supp. 702, 705 (S.D.N.Y.1990). However, plaintiff has easily established the elements of a prima facie case without the benefit of the presumption.

■ With respect to delivery in good condition, prior to plaintiff's purchase of the machines, plaintiff's shop foreman examined them in detail, actually operated them, and found that all were in good mechanical running condition, free of rust and properly maintained. Ex. 270, pp. 30–36. James Rodia, the Wilson plant foreman, testified also that the machines were in working order and free from rust when they were shipped from the plant, Ex. 281, pp. 22–23, 77–78, and Chambers of Wilson testified that the only rust on the machines was slight surface rust that could be removed merely by wiping the machines and that the machines were in good running condition. Ex. 279, pp. 13–14, 19, 23–24. Nedlloyd points to deposition testimony from Ronald Bodell, whose company also purchased machines from Wilson, that his machines were rusty when he picked them up at the plant. Ex. 285, pp. 24–25. However, that testimony provides at best only a speculative basis for determining that *plaintiff's* machines were not in good condition and does not contradict the testimony of plaintiff's shop foreman, of Rodia and of Chambers about the machines in suit. Moreover, as detailed below, the fact that only those machines whose tarpaulins were badly ripped while on board Nedlloyd's ships suffered significant rust corrosion while machines whose tarpaulins were undamaged suffered no corrosion damage creates an obvious inference that all of the machines were in good condition without rust at the time they were loaded onto Nedlloyd's ships.

With respect to receipt in bad condition, it is especially clear that the extensive corrosion damage to machines 18, 19 and 9—to which all but a small portion of the damage claimed by plaintiff pertains—was caused by their exposure to salt water and salt water spray as the result of the ripping of their tarpaulins while carried on the decks of the Rosario and the Rouen. According to plaintiff's surveyor Rivenet, who examined the damaged machines after their arrival in Calais, the tarpaulins on these three machines were either completely ripped or so extensively ripped from the back of the containers to the front that all or a large portion of each container was uncovered and the contents were directly exposed to the elements. Ex. 272, pp. 27, 36, 41–43. Nedlloyd's own surveyor concurred in Rivenet's opinion that the ripping of the tarpaulins occurred while on board their vessels and prior to their arrival in Le Havre. Ex. 277, pp. 25–26, 127. With respect to these three machines, there was water on the floor of the containers, in the machines themselves and in the cases of bobbins and carriages that had been separately packed in plastic. The water was tested with silver nitrate and found to be salt water. Ex. 272, pp. 34, 38–39, 47–48. *See also* Tr. 2335 ff. (testimony on use of silver nitrate to determine extent of corrosion by salt water). Rivenet found extensive oxidation on those parts of the machines that were not covered because of the ripped tarpaulins as well as on the bobbins and carriages in those containers. Ex. 272, pp. 32, 37–39, 44. Rivenet's testimony concerning the conditions of those tarpaulins and the rust on the machines, carriages and bobbins was also confirmed by the series of photographs that he took of those machines. Exs. 148–154. Although

Nedlloyd contends that the tarpaulin to the container with machine 9 was in good condition but had been loosened because the line was defective, it is clear by examination of the photographs that that tarpaulin was in fact ripped. Ex. 153. It is possible that the damage to these machines was exacerbated by the containers being left in rain after their arrival in Le Havre and prior to truck transport to Calais, *see* Ex. 277, pp. 63–66, but the machines were still in Nedlloyd's custody at that time.

The three machines—18, 19 and 9—that were stowed on deck and whose tarpaulins were extensively ripped sustained by far the most corrosion. Machine 26, carried on the deck of the Rouen, was the only machine stowed on deck whose tarpaulin was not damaged. That machine suffered no corrosion. The tarpaulin covering the container with machine 22, which was carried on deck the Rosario, was torn at one place at which it rested on a support, and the part of the machine directly under the hole in the tarpaulin was wet and sustained rust damage. Ex. 272, p. 49; Ex. 277, pp. 25–26. However, plaintiff submitted no claim to the surveyors for machine 22 and seeks no recovery for damage to that machine. The tarpaulin on the container with machine 17, carried on the deck of the Strathconon, sustained three holes above the machine's loom, and there were small traces of oxidation on the machine below those holes. According to Rivenet, wind conditions could have caused friction between the tarpaulin and the machine creating the holes. Ex. 272, p. 17. The tarpaulin on the container with machine 16, one of the four carried below deck on the Strathconon, sustained a meter-long tear. While some rust on the part of the jacquard located directly under the tear was found, the possibility that this damage might have occurred before stowage or after unloading hardly rebuts the overwhelming evidence that the severe corrosion damage to machines carried on deck occurred as a result of the on deck stowage. Indeed, the other three machines, stowed below deck, sustained no damage. As will be discussed below, the heavy winds and high waves on the North Atlantic at the time of the voyages, especially given the location and positions in which the containers were stowed and the fact that the tarpaulins did not completely cover the containers owing to the overheight cargo, further confirm that the tarpaulins were ripped and the corrosion to the machines was caused by wind, salt water and sea spray while the machines were being transported on Nedlloyd's decks.

Accordingly, I find that plaintiff has established that its cargo was damaged while in Nedlloyd's custody.[4]

B. *Nedlloyd Has Not Rebutted Plaintiff's Prima Facie Case*

To rebut a prima facie case of liability for damage to cargo, a carrier must come forward with evidence to explain the cause of the damage, showing that the damage resulted from one of the excepted causes set forth under COGSA, 46 U.S.C.App. § 1304(2). If that burden is met, "the burden return[s] to the plaintiff to show that the carrier's negligence contributed to the damage." *O'Connell Mach. Co. v. M.V. "Americana,"* 797 F.2d 1130, 1133 (2d Cir.1986). *See also Montedison U.S.A., Inc. v. S/S AL WATTYAH*, No. 87 Civ. 8545 (JMW), 1989 WL 165874, 1989 A.M.C. 2287 (S.D.N.Y. Apr. 3, 1989); *United States v. Ultramar Shipping Co.*, 685 F.Supp. 887, 897 (S.D.N.Y.1987), *aff'd*, 854 F.2d 1315 (2d Cir.1988). Notably, the carrier has the duty under COGSA, 46 U.S.C.App. § 1303(2), to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." For the following reasons, I find that Nedlloyd has not met its burden of showing that the damage arose under one of COGSA's excepted causes and that, in any event, Nedlloyd was

---

**4.** It is undisputed that Nedlloyd was a "carrier" with respect to the Strathconon, but plaintiff has made no attempt to meet its burden of proving that defendant Australia Japan was a party to the contract of carriage for the Strathconon and thus a "carrier" for purposes of COGSA, 46 U.S.C. § 1301(a), *see Centennial Ins. Co. v. M/V Constel-* *lation Enterprise*, 639 F.Supp. 1261, 1265 (S.D.N.Y.1986); *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 594 F.Supp. 1490, 1497–98 (S.D.N.Y.1984), *aff'd in part and vacated in part on other grounds*, 782 F.2d 329 (2d Cir. 1986). The claims against Australia Japan will be accordingly dismissed.

negligent in stowing the containers on deck in the circumstances of this case and did not meet its duty under § 1303(2) in its stowage or care of the cargo.

### 1. *Sufficiency of Packing*

■ Nedlloyd argues it is not responsible for the damage to plaintiff's cargo because it resulted from "insufficiency of packing," an excepted cause. 46 U.S.C.App. § 1304(2)(n). Whether packing was insufficient under § 1304(2)(n) depends on whether the cargo was "properly packed for the anticipated voyage." *Mobil Sales & Supply Corp. v. M.V. "Banglar Kakoli,"* 588 F.Supp. 1134, 1141 (S.D.N.Y.1984). *See also Close v. Anderson,* 442 F.Supp. 14, 17 (W.D.Wash.1977) ("packing must be sufficient to withstand normal and reasonably foreseeable events").

After Betschart provided Nedlloyd with the precise dimensions of the machines, Tr. 696–97, 1603; Exs. 1, 2, Ex. 269, p. 31, from which it was clear that the machines would stand one-and-one-half to two feet higher than the sides of Nedlloyd's open-top containers, given the eight-inch platform at the base of those containers, Nedlloyd furnished tarpaulins that would have been able to completely cover the containers only if there had been no overheight cargo and which were adequate here only for transport below deck. Because of this overheight of the machines, it was necessary for plaintiff's packer to skip some eyelets and grommets and to leave readily visible gaps at the top rear of the containers through which water could enter and through which winds could be expected to enter creating a likelihood that the tarpaulins would be ripped if the containers were stowed on deck and expose the cargo to even more water. Tr. 2297–2302.

Plaintiff's witness Robert A. Raguso is a meteorologist for Bendix Field Engineering which furnishes weather routing services to carriers such as Nedlloyd. Raguso gave credible, knowledgeable testimony that was not rebutted that voyages across the North Atlantic during October should be expected to encounter numerous frontal passages which would create serious gusty conditions. Tr. 85–87, 137–39. He provided calculations of the wind force sustained by each of the three ships and also provided data concerning the sea and swell conditions encountered by each of the vessels. He testified that swell of at least five to six meters, driven by winds as high as Beaufort 7 to 10, would have resulted in heavy sea spray in each case that, especially given the up-and-down motion of a ship in such conditions, could be expected to reach containers on deck despite their being surrounded by other containers. Tr. 79–107, 125–26, 137–39. Raguso testified that had his company been involved with cargo like plaintiff's, notified of sensitive overheight cargo stowed in open-top containers on deck, a safer route to minimize the effects of wind and water would have been recommended. Tr. 52, 58–60, 66; *see also* Tr. 2302, 2319.

Raguso's testimony was confirmed by some of Nedlloyd's own witnesses. Ole A. Sweedlund, a licensed Merchant Marine officer who was associated in 1986 with Trans Freight Lines and supervised the department that stowed various Trans Freight and Nedlloyd ships, Tr. 2091, 2142, 2158, acknowledged that weather conditions on the North Atlantic in October were quite variable and "you could end up in situations where you have heavy storms and very confused and scattered seas. You could end up, in October, in hurricanes. It's a meteorological nightmare." Tr. 2142. Captain Robert Meurn, co-author of a text on marine cargo operations, acknowledged that winds up to 9 to 10 on the Beaufort scale experienced by the Strathconon on October 3 and 4 were certainly possible during the month of October. Tr. 2235. He confirmed the possibility of ripping of the tarpaulins on overheight open-top containers stowed on deck given the winds and heights of waves that could be encountered in the North Atlantic at the time of the voyages. Tr. 2238. John Boylston, president of a firm that operates two carriers, admitted there is a "good probability of severe weather in October" on the North Atlantic, a "good probability in any open top that the top would be taken off," and thus a "good probability you're going to expose contents to rain or salt water." Tr. 1225–27. Based on such statements, it is clear that even surrounding on deck containers with higher tiers of other containers (which Ned-

lloyd proffers as a point in its own defense) was not sufficient to do away with the danger of expected levels of wind and sea spray foreseeably causing the tarpaulins on plaintiff's containers to rip and subject their contents to salt water.

In support of its argument that plaintiff is responsible for the damage in this case because of insufficient packing, Nedlloyd offers testimony of Sid Watts, a director of Spowage, Humphreys & Wyer, and testimony of Jack Hughes, a textile engineer who had worked for Spowage and other firms and who had previously shipped 88 Leavers lace machines across the world, concerning steps they took in preparing lace machines for shipment. Nedlloyd argues that to have protected the machines from water damage precautions such as those taken by Watts and Hughes with their own machines should have been taken here. These included procedures that were followed by Chambers in the packing here, such as wrapping the comb bars and points on the machines in plastic and separately wrapping the bobbins and carriages in plastic, as well as additional procedures. The additional precautions described were first wrapping the comb bars and points with cheesecloth soaked in oil and greaseproof paper rather than only wiping them down with oil before wrapping them in plastic; applying a rust protector to the shafts; using extra plastic around the entire machine; and tying an additional tarpaulin around the machine to completely cover it inside the container. Tr. 393–96. Hughes testified such measures could have protected the machines in the event of exposure to water as a result of on deck stowage. Ex. 284, pp. 68–69, 120–24.

I agree that the packing was not sufficient to protect the machines against corrosion resulting from on deck stowage, and additional precautions would have been reasonable and indeed necessary had on deck stowage been anticipated. This is made even more so by the foreseeability of the harsh weather and wind conditions to be encountered on this voyage. However, Nedlloyd has not shown (nor does it argue, except with respect to mechanical damage for which plaintiff does not seek damages herein) that plaintiff's packing was insufficient for purposes of below deck stowage. The determination of whether the packing in this case was insufficient under § 1304(2)(n) for purposes of relieving Nedlloyd of liability to plaintiff therefore turns on whether plaintiff should have reasonably expected on deck stowage. Indeed, it is difficult to believe the machines would have been packed in these open-top containers in the manner in which they were if on deck stowage were at all expected. (It is undisputed that plaintiff's Van der Riet had instructed Reichel of New York Express to obtain under deck stowage.) But the evidence is clear for other reasons that plaintiff did not and reasonably should not have anticipated it.

### a. Clean Bills of Lading

■ When a bill of lading is "clean," a shipper has the right to below deck stowage.

> Absent an express agreement by the shipper permitting cargo to be stowed on deck or a general port custom permitting on deck stowage, a shipper is entitled to expect below deck stowage under a clean bill of lading.... To reiterate, a shipper's reasonable expectation on booking cargo for shipment is that it will be stowed below deck, unless the shipper agrees to the contrary or a general port custom permits the above deck stowage.

*Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 299 (2d Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). *See also English Electric Valve Co. v. M/V Hoegh Mallard,* 814 F.2d 84, 89 (2d Cir.1987); *Seguros Banvenez, S/A v. S/S Oliver Drescher,* 761 F.2d 855, 859 (2d Cir.1985) ("absent an agreement or an established custom from which consent of the shipper for on-deck stowage may be imputed, a clean bill of lading imports stowage below deck"); *Neuenberger Schweizerische Allgemeine Versicherungs–Gesellschaft v. S/S Aldebaran,* No. 88 Civ. 1361 (RJW), 1990 A.M.C. 1886, 1989 U.S.Dist. Lexis 15142 at *11 (S.D.N.Y. Dec. 19, 1989). Thus, in *Hojgaard & Schultz A/S v. Transamerican S.S. Corp.,* 590 F.Supp. 916 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985), where the shipper had a right to below deck stowage under a clean bill of lading and cargo stowed on deck was

damaged, because "plaintiffs' cargo was adequately packed for under deck shipment," the packing was "sufficient" under § 1304(2)(n). *Id.* at 923.

■ There is no question that the three bills of lading were, for purposes of stowage below deck, clean, since they did not specify on deck stowage. That the bills of lading contained a form clause giving the carrier the option to stow goods on deck without notice to the shipper[5] does not alter the conclusion that they were clean or its import for these purposes. *See, e.g., Hojgaard & Schultz A/S v. Transamerican S.S. Corp.*, 590 F.Supp. at 921, where this court explained why such a clause was unavailing to defendant even after the defendant refused to sign a booking note with the words "On Deck" crossed out. As indicated above, the only situations in which on deck stowage may be used are those where the shipper has agreed specifically to it or a general port custom would permit it.

### (i) *Lack of Agreement*

■ As Nedlloyd argues, plaintiff's freight forwarder Goth could have expressly insisted on below deck stowage and did not do so. Witnesses for Nedlloyd testified that shippers can expressly request below deck stowage, which carriers can then accept or refuse; if refused, the shipper can do whatever it deems necessary, such as further negotiating, acquiescing or going to another carrier. It does not follow, however, that Goth's failure to have expressly requested below deck stowage imports consent to on deck stowage, and the circumstances of this case render the possibility of such implied consent nil.

Betschart of Goth testified that after his initial discussions with Reichel of New York Express in July 1986, he spoke to Sal Colonna of Nedlloyd, giving him the weight and dimensions of the machines, and sought rates for transportation of the machines on flatbed trailers or mafis in ro-ro vessels. Reichel then advised him that the machines were not, as had been thought originally, too wide as well as too high to fit inside containers and that Betschart should therefore request rates based on loading in open-top containers which would better protect the spare parts

than flat-bed racks. Tr. 686–92, 866–67. Betschart again contacted Nedlloyd and spoke to Randy Clayton, the salesperson for Nedlloyd who took over the negotiations with Betschart. Tr. 692–93. Betschart again gave the dimensions of the machines and asked for rates based on transportation in containers but open-top ones, since the machines were too high to fit fully in a container and would have to protrude from the top. Tr. 693; Ex. 269, p. 16. According to Betschart, his understanding was that, since the shipments would be on ro-ro ships, "this kind of cargo" would be carried below deck, although he made no specific request for such stowage. Tr. 693–94. He testified that "during one of my conversations with Clayton while we were negotiating the rates, I asked Mr. Randy Clayton where these containers will be loaded, and he told me that this kind of container will be stowed in belly of the vessel." Tr. 696. Clayton testified that he did not recall a discussion with Betschart of where the machines would be stowed, Ex. 269, p. 20, but he also testified that he assumed that the machines would be stowed under deck because, since overheight cargo like these machines could not be overstowed, it would be "absolutely asinine" and "negligent at best" to put such cargo on the top layer of on deck cargo, where "it wouldn't be protected in any way, shape or form from weather." *Id.* pp. 20–21. Even if Betschart had expressly asked for under deck stowage, Clayton testified that it is possible that he would not have made a note of it since he would have assumed that the only way to handle such cargo was under deck. *Id.* p. 23.

Although it was in Betschart's self-interest to claim that Clayton had made the statement he attributes to him, and despite some vagueness on Betschart's part about the immediate context of his question to Clayton, I nonetheless find it likely that Betschart asked such a question and that Clayton made such a statement about below deck stowage. I find it significant that Clayton, while not recalling such an exchange with Betschart, did not deny that it occurred and so emphatically concurred in the position Betschart

---

**5.** *See* page 698 n. 3, *above.*

claims Clayton expressed that below deck stowage was necessary. Indeed, Clayton was so emphatic about his belief and automatic assumption that under deck stowage was the only way to stow these overheight machines in open-top containers that he stated that he might not have specially noted a specific request by Betschart for such stowage, even if it had been made. Under these circumstances, I accept the account of Betschart, who, moreover, was a credible witness. (Clayton was not put on the stand, testifying only by deposition.)

Nedlloyd is, of course, responsible for any such statement by its sales personnel to its customers, and it cannot hope to make a virtue out of one corporate hand not knowing what the other is doing. The point of the statement in this context is not that it establishes a contractual undertaking to stow below deck but that it reinforces the presumption attaching to the clean bills of lading that were issued by Nedlloyd that there was no consent by plaintiff to on deck stowage and that plaintiff's reasonable expectation was that the machines would be stowed below deck.[6]

### (ii) *Port Custom or Practice*

■ Nedlloyd contends, on the basis of statements by experts on cargo operations and officers in other companies operating carriers, that on deck stowage of overheight open-top containers is a common practice in the Port of New York. However, as explained below, this testimony did not meet Nedlloyd's burden of establishing that a custom or practice in support of on deck stowage exists in circumstances relevant to this case, *i.e.*, with cargo known to be lace machines; stowed in open-top containers whose tarpaulins could not completely cover them; scheduled for transportation across the North Atlantic at a time of year when heavy winds, high swells and storms are foreseeable; and notwithstanding the obviousness, confirmed by its own salesperson's clear understanding, without even needing to be told, that the machines had to be stowed below deck.

Nedlloyd's argument that on deck stowage was reasonable is based on the following. According to the testimony of Raymond Miller, Marine Operations Manager for Atlantic Container Line, on ships that are specialized for stowing containers, containers (including open-top containers) are ordinarily loaded onto the ship by crane ("loaded on, loaded off" or "lo-lo"). On container ships or on ro-ro ships that are also outfitted with hatches for below deck stowage, such cranes can be used to stow open-top containers either on deck or in specially fitted cell guides below deck through the hatches. However, the Rosario and Rouen were hatchless ro-ros, which meant that below deck stowage of containers would have had to involve use of a mafi or trailer to roll them on and off, a procedure that could have been used but would have involved more time and labor than on deck stowage. Tr. 2092, 2140. Nedlloyd contends that on deck stowage of open-top containers was reasonable on the basis of three general considerations: (1) stowage considerations themselves (whether stowing in a certain way will leave sufficient room for other cargo and whether a stowing plan will affect the ship's speed and balance); (2) port rotation (how much time must be spent in each port or devoted to rearrangement of cargo or driving off as opposed to lifting off cargo); and (3) labor costs.

Even on the basis of these general considerations which routine port custom or practice might take into account (but which glaringly happen to exclude certain key duties set forth in COGSA), there was no adequate basis for Nedlloyd's on deck stowage in the instant case. Approximately 45% of the below deck stowage space was empty on the Strathconon, leaving 244 vacant spots, even after machines 13, 14, 15 and 16 were put there (although machine 17 oddly was put above deck), approximately 30% was empty on the Rouen, and the Rosario was completely empty below deck. Tr. 1192–93; Ex. 280, pp. 54, 115, 139. Since below deck clearance for the Rosario and Rouen is 6.35 meters or about 20 feet, below deck stowage of the

---

6. There is no evidence that the negotiation of a price between Betschart and Clayton had anything to do with choosing a location for stowage, and Nedlloyd's published rate sheet shows only a single rate for either above deck or below deck stowage.

containers on mafis would not have presented a problem, especially in view of the amount of space that remained vacant. Tr. 1237. Thus, there was no showing that placement of open-top containers on mafis or trailers to load them below deck on the two ro-ros would have been especially inconvenient, much less that it was unfeasible or that it involved so much time and expense that its avoidance would outweigh "substantially increas[ing] the exposure of [plaintiff's machines] to foreseeable dangers." *General Electric Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 86 (2d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).[7]

Plaintiff put forward convincing expert testimony disputing the existence of any custom or practice in the Port of New York in favor of on deck stowage of overheight open-top containers absent agreement by the shipper or circumstances not present here. Captain William McManus, Director of Marine Operations for United States Lines from 1979 through 1989, testified that, except for hazardous cargo, it was United States Lines' policy to stow open-top containers with overheight cargo below deck. Tr. 2294–95, 2325. Captain Ivo Knobloch, a marine surveyor and consultant, testified as to the responses of carriers and agencies operating out of the Port of New York to inquiries in a questionnaire he had prepared for plaintiff about on deck stowage of cargo. The responses reflected a common understanding that open-top containers are "generally" stowed below deck. Ex. 250D. Although only two of the twenty-one respondents answered that they shipped open-top containers on ro-ro vessels, it is noteworthy, given Nedlloyd's arguments that a presumption of on deck stowage of open-top containers is appropriate for such vessels, that the one steamship agency that said it shipped *all* of its containers on ro-ro vessels answered that its company policy regarding the handling and stowage of open-top containers was "Below Deck Stowage," and the second company, which divided its open-top containers be-

tween ro-ro vessels and container ships, stated that both open-top containers in general and open-top containers with cargo that was overheight or "humidity-sensitive" are generally stowed below deck and that, if such open-top containers had to be shipped on deck, the shipper would be informed beforehand. Although Nedlloyd faults this evidence because it is not emphatic (given its recourse to such terms as "generally" and some imprecision about the kinds of ships to which the responses applied), the responses to the questionnaire do nonetheless serve generally to rebut Nedlloyd's claim that there exists a custom or practice in favor of on deck stowage, and it is Nedlloyd who has the burden to make that showing. The questionnaire evidence is, moreover, only one item of proof relevant to the issue among all the others.

Indeed, Nedlloyd's claims were undercut by concessions and qualifications made by its own expert and employee witnesses. Even Miller confirmed that if his company were presented with open-top containers holding overheight cargo with tarpaulins such as those involved in this case for on deck shipment, "We would go and investigate the container. If there is a problem like this, we would get a hold of our traffic people to notify the shipper that this is a problem and what should we do with it," adding that it would be "preferable" to place such a container below deck. Tr. 1795–96. Meurn, while maintaining that stowing an overheight open-top container on deck was a "reasonable" practice, conceded it was not the "preferred" practice and had written in his text on Marine Cargo Operations in 1985 that "[o]pen or canvas-top containers must be stowed under deck or at least under another container on deck." Tr. 2210. Meurn further admitted that if an open-top container with overheight cargo on which the tarpaulin was not fully secured were received on board, the officers on the ship whose duty is to assure proper stowage should make a "written exception to the bill of lading" and

---

7. To the extent Nedlloyd's decisions were a function solely of expense associated with port rotation, the concluding proviso to 46 U.S.C.App. § 1304(4) ("if the deviation is *for the purpose of loading or unloading cargo* or passengers it shall, prima facie, be regarded as unreasonable," emphasis added) itself casts doubt on them.

the shipper should be notified. Tr. 2229–35. Nedlloyd's own terminal manager at Port Elizabeth and a former port captain Bernardus Janse stated that if open-top containers were stowed on deck they "should be covered with other containers in order to give them maximum protection"—something that is not possible, however, for an open-top container with cargo that is one-and-one-half or two feet overheight—and "[i]n case there was a possibility to stow them underdeck and that would not create any extra requirement on us, and wouldn't make the operation too difficult, then we would put them underdeck if that was possible." Ex. 280, p. 237. Given the testimony of Nedlloyd witnesses Sweedlund and Boylston on the probability of wind, storms and swells in October on the North Atlantic, yet another qualification to the breadth of any possibly existing custom or practice obviously would be that on deck stowage should not be attempted with overheight cargo in open-top containers whose tarpaulins were incompletely fastened especially during that time of year. Thus, to the extent any custom or practice with respect to on deck stowage can be said to exist even on the basis of the testimony of Nedlloyd's own witnesses, it is one that cautions that such stowage is to be avoided if at all possible and, if not avoidable, undertaken only after deliberation by ship officers responsible for stowage and consultation with or at least notification to the shipper or forwarder. In the case of plaintiff's machines, however, Nedlloyd made no attempt to avoid such stowage or to confer on whether and how to proceed or to notify plaintiff or its freight forwarder Goth.[8]

The two key Second Circuit cases cited by Nedlloyd in connection with its argument do not support it here. In *English Electric Valve Co. v. M/V Hoegh Mallard,* 814 F.2d 84 (2d Cir.1987), it was held that on deck stowage of an open-top container holding sensitive electronic equipment damaged by heavy rains and salt water was not an unreasonable deviation for purposes of § 1304(4) of COGSA (*see* page 41, n. 11, *below* ). However, in that case there was clear evidence of previous on deck shipments involving the same shipper and carrier and the same kind of equipment and that it was their normal practice for the shipper to notify the carrier if it wanted its cargo stowed below deck. 814 F.2d at 89. In our case, however, there were no past dealings between Nedlloyd and either plaintiff or its freight forwarder, and indeed Nedlloyd was offering the whole industry a relatively new service. With respect to another reason for the court's holding in *English Electric Valve Co. v. M/V Hoegh Mallard* pointed out by Nedlloyd, that "the custom and practice in the industry is to carry open top containers on deck when the vessel specifically is designed for such use ... based on uncontroverted testimony from witnesses for both parties," *id.,* the case involved shipment from Oakland to England by way of a Pacific Northwest–Northern Europe route and does not establish the custom and practice in the Port of New York. Our case involves a different port, hotly controverted testimony about the existence of any custom or practice there, a voyage across the North Atlantic and a much narrower framing of the relevant questions for that purpose.

*O'Connell Mach. Co. v. M.V. "Americana,"* 797 F.2d 1130 (2d Cir.1986), on which Nedlloyd also relies, involved on deck stowage of a machine that had been placed on a flat-rack container which fell from the container and was lost at sea. The Second Circuit found that the proximate cause of the loss was insufficient packing, not the location of the stowage, pointing out that its destruction "resulted not from wind, water or sea spray— the risks generally associated with deck stowage—but from slippage and falling." 797 F.2d at 1133. And again, as the court said in "[a]ddressing the question of whether [on deck stowage] was reasonable ... we look to international custom *in the port in question,*" *id.* at 1136 (emphasis added),

---

8. Other considerations in this case even further undermine Nedlloyd's argument. Given its salesperson Clayton's testimony, Nedlloyd is forced to take an unusually brazen position, arguing that plaintiff's *only* reasonable expectation should have been stowage of the containers on deck the ro-ro vessels, even though Clayton's clear understanding, belief and probable statement to Betschart were to the contrary. As noted, any lack of communication between Nedlloyd's sales and operations departments is not something for which plaintiff can be held responsible.

which in that case was Genoa, Italy where such was the custom for the type of containers involved in that case. Space limitation on the ship was an additional factor not present here. Our case presents the corollary to that case since it involves precisely those risks that are "generally associated with deck stowage." [9]

In sum, plaintiff's expectation of below deck stowage was entirely consistent with the circumstances and, for all the foregoing reasons, Nedlloyd's burden of supporting its argument that the packing of the cargo was insufficient for this anticipated voyage under the meaning of COGSA and provides an "excepted cause" under § 1304(2) has certainly not been sustained.

### 2. Nedlloyd's Negligence

Even had Nedlloyd showed insufficient packing, that showing would merely have shifted the burden back to plaintiff to show that Nedlloyd's negligence nevertheless contributed to the damage. Plaintiff would thus prevail, in any event, because Nedlloyd clearly breached its duty under 46 U.S.C.App. § 1303(2) to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried," and, even in the absence of the express duty imposed on it by statute, was negligent under the application of principles of common law to industry standards and common sense in the circumstances of this case.

As discussed above, everyone involved in this transaction, including Clayton, the Nedlloyd employee who negotiated with plaintiff and arranged for the shipment, believed this cargo would be transported below deck. Nedlloyd, fully aware of the dimensions of these machines, furnished the open-top containers and the tarpaulins that would not be able to fully cover the machines because of their height. The harsh weather encountered on the voyage, causing ripping by the wind and swells and spray of the sea's salt water onto the ship, was foreseeable. It is obviously for this reason that Clayton testified that to stow this cargo on deck where "it wouldn't be protected . . . from weather" was "absolutely asinine" and "negligent at best." As indicated earlier, Nedlloyd's own expert witnesses confirmed that this cargo should have gone below deck or not on deck without consultation with the shipper as to additional precautions. Furthermore, Nedlloyd's stowage of the on deck containers facing the direction of the wind made the foreseeability of the tearing of the tarpaulins even greater.

Finally, although a carrier is not required to inspect goods for defects, it is required "to exercise due diligence in attending to visible packaging inadequacies." O'Connell Mach. Co. v. M.V. "Americana," 797 F.2d at 1133. Especially in view of the predictability of the wind and swell conditions on the North Atlantic, Nedlloyd's disregard of the visibly insufficient coverage of the containers by its tarpaulins for purposes of on deck stowage was a further element of failure to exercise due diligence. Yet another element of Nedlloyd's lack of due diligence was its failure to care for the cargo after it had been stowed. Although it is likely that some of the seamen observed or at least should have observed the damage to the tarpaulins on the Rosario and Rouen, no attempt was made to repair ripped tarpaulins en route. Although the weather was at times too severe to have attempted such repairs, at other times (e.g., with winds at levels of Beaufort 4 or 5), according to the testimony of even one of Nedlloyd's own experts, repairs could have been attempted without any danger to the crew. Tr. 1229. Furthermore, Nedlloyd failed to carry any extra tarpaulins on any of these ships despite the foreseeability of ripping, Ex. 280, p. 180, although it could have and, according to its own expert, should have done so. Tr. 1229. In addition, whatever may be otherwise said as to the foreseeability of severe weather conditions at the time, as the Rouen did not

---

**9.** O'Connell Mach. Co. v. M.V. "Americana" recalls the well known case, Gorris v. Scott, L.R. 9 Ex. 125 (1874), in which violation of a statute requiring ships to provide separate pens for stock was held not to have been the proximate cause of the loss of sheep washed overboard, even though such pens would have prevented the loss, because the statute was intended only to guard against exposure of stock to disease. By the very terms of its holding, recovery would have been permitted had some of the sheep contracted anthrax from other sheep, just as O'Connell Mach. Co. v. M.V. "Americana" obviously permits recovery in the circumstances of the instant case.

depart until one week after the Strathconon had arrived in Le Havre, Nedlloyd had or should have had knowledge of the *actual* weather encountered by the Strathconon, yet still simply put the containers on the Rouen on deck.

## II. NEDLLOYD IS LIABLE FOR THE COMPLETE LOSS BECAUSE STOWAGE ON DECK WAS AN "UNREASONABLE DEVIATION" FROM THE CONTRACT OF CARRIAGE

 Nedlloyd contends that even if it is liable for damages to plaintiff, its liability is limited to $500 per machine pursuant to clause 27 of its bills of lading.[10] Under COGSA, 46 U.S.C.App. § 1304(5), a carrier may limit its liability for damage to cargo to $500 per "package," unless the shipper has expressly declared the value of the cargo and that value is noted in the bill of lading. It is undisputed that plaintiff did not declare the value of its cargo in the bill of lading. However, a carrier cannot avail itself of the limitation of its liability to $500 per package if it has engaged in an "unreasonable deviation from the contract of carriage." *General Electric Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d at 83. Two categories of such deviations, those pertaining to change of route and, notably, those pertaining to on deck stowage, are recognized as implicit in COGSA, 46 U.S.C.App. § 1304(4).[11] *Sedco, Inc. v. S.S. Strathewe,* 800 F.2d 27, 31–32 (2d Cir.1986); *B.M.A. Industries, Ltd. v. Nigerian Star Line, Ltd.,* 786 F.2d 90, 91–92 (2d Cir.1986); *Seguros Banvenez, S/A v. S/S Oliver Drescher,* 761 F.2d at 859–60; *Norwich Union Fire Ins. Soc., Ltd. v. Lykes Bros. S.S. Co.,* 741 F.Supp. 1051, 1053 (S.D.N.Y. 1990). A deviation is unreasonable, thereby breaching the contract of carriage, "when, in the absence of significant countervailing factors, the deviation substantially increases the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred." *General Electric Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d at 86. In such a case, the carrier becomes an insurer of the cargo, liable to the shipper for the entire loss. *Ingersoll Mill. Mach. Co. v. M/V Bodena,* 829 F.2d at 301; *General Electric Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d at 83. Since the bills of lading issued here were clean, the burden of proof was on the carrier Nedlloyd to demonstrate that its deviation was reasonable (which it may do by showing either that plaintiff agreed to on deck stowage or that there was a custom or practice in the New York port from which such consent could be imputed). For the reasons already discussed at length herein, Nedlloyd's on deck stowage of these machines constituted an unreasonable deviation, and it cannot avail itself of the $500 limitation.[12]

## III. PLAINTIFF'S CLAIMS AGAINST OTHER PARTIES AND THE DEFENDANTS' CROSS–CLAIMS

### A. Plaintiff's Claims Against New York Express, Associated and Goth

Plaintiff has sought damages from New York Express, Associated or Goth only if the

---

**10.** Clause 27 of the bills of lading contained the following provision: "Special mention is made of Section 1304(5) of U.S.C. COGSA providing that the Carrier and/or the vessel's liability shall not exceed US $500 per package or customary freight unit unless the nature and the value of the Goods have been declared...."

**11.** 46 U.S.C.App. § 1304(4) provides as follows: "Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

**12.** Although plaintiff has also brought claims against Nedlloyd under common law, because its claims against Nedlloyd are controlled by COGSA, which provides exclusive remedies against carriers for shippers whose goods are damaged during shipment from the United States to a foreign port, alternative or supplementary liability under state law is barred, and those claims will be dismissed. *Jones v. Compagnie Generale Maritime,* 882 F.Supp. 1079, 1082–83 (S.D.Ga. 1995); *Sail America Foundation v. M/V T.S. Prosperity,* 778 F.Supp. 1282, 1285 (S.D.N.Y.1991); *Armada Supply, Inc. v. S/T Agios Nikolas,* 613 F.Supp. 1459, 1469 (S.D.N.Y.1985); *Miller Export Corp. v. Hellenic Lines, Ltd.,* 534 F.Supp. 707, 710 (S.D.N.Y.1982); *B.F. McKernin & Co. v. United States Lines, Inc.,* 416 F.Supp. 1068, 1071 (S.D.N.Y.1976).

court finds that Nedlloyd did not unreasonably deviate from its contract. Since I find that Nedlloyd is liable to plaintiff for the complete recoverable loss under COGSA for unreasonable deviation, plaintiff's claims against the others will be dismissed.

### B. *The Defendants' Cross–Claims*

■ Nedlloyd's claims for indemnity against New York Express, Associated and Goth are without merit. Nedlloyd contends that New York Express allegedly failed under its contract with plaintiff to hire a competent rigger in Associated and failed to request that Goth obtain under deck stowage. It claims Associated failed to pack the containers properly and that Goth, if it received instructions from New York Express to obtain under deck stowage, was required to request it specifically from Nedlloyd. But Nedlloyd cites no authorities to support such claims for indemnity, and that is, no doubt, because none exists. As set forth earlier at length, in the circumstances of this case, Associated's packing was not deficient and Nedlloyd's Clayton knew the stowage had to be under deck. More important is that *even if* any of those other defendants were somehow found to be liable *to plaintiff* for any failures, Nedlloyd has no basis for recovery from them. Because the bills of lading were clean and custom and practice did not permit otherwise, Nedlloyd was required to stow the cargo below deck. It did not obtain (or even seek) consent from plaintiff to do otherwise. The claim that because a carrier allegedly was not requested expressly to stow below deck it is relieved of its obligations and absolved of this duty suddenly turns COGSA on its head. Thus, even assuming *arguendo* its factual allegations were proven and the other defendants, as plaintiff's agents in this case (*see, e.g., Reisman v. Medafrica Lines, U.S.A.*, 592 F.Supp. 50, 53 (S.D.N.Y.1984)), breached their obligations to plaintiff, Nedlloyd's claims for indemnity from them are not cognizable. *See, e.g., Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d at 305. Nedlloyd's cross-claims (as well as Associated's and Goth's cross-claims against Nedlloyd and New York Express) will be dismissed.

### IV. *DAMAGES*

#### A. *Compensatory Damages Based on Fair Market Value*

Plaintiff seeks to recover $533,969 in damages ($325,551 already incurred at time of trial and an additional $208,418 in anticipated expenditures). The amount consists almost entirely of the cost of repair and replacement parts of the three machines that were heavily damaged on board the Rosario (machines 18 and 19) and Rouen (machine 9). The amount also includes the $3,287 cost of repair of the corrosion on machine 17 carried on the Strathconon. Nedlloyd does not take issue with the $3,287 sum, but with respect to machines 18, 19 and 9, Nedlloyd argues damages should be no greater than $68,600, the price plaintiff paid in purchasing them as shown in the applicable invoices ($22,000 for each machine plus an additional $2,600 for parts (two spare warps, a bobbin winding machine and sets of carriages and bobbins)). Exs. 193–194. Alternatively, Nedlloyd puts forward a figure for the three machines that is $8,900 more, based on estimates given by witnesses of the fair market value of similar machines. For the following reasons, I must deny plaintiff's request for recovery of its actual cost of repairing the three machines and find that Nedlloyd's alternative figure is the appropriate benchmark for damages.

■ "Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive." *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir.1987). *See Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 540 (2d Cir.1994); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d at 18. "In no event shall the carrier be liable for more than the amount of damage actually sustained." 46 U.S.C.App. § 1304(5). *See Thyssen, Inc. v. S/S Eurounity*, 21 F.3d at 540. A plaintiff may recover the "reasonable and necessary costs for repairing or reconditioning the damaged cargo *where such costs were less than the diminution in market value sustained and did not exceed the value of the cargo prior to in-*

*jury." Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y. 1970) (emphasis added). *See also DiMillo v. Sheepscot Pilots, Inc.,* 870 F.2d 746, 751–52 (1st Cir.1989); *O'Brien Bros. v. The Helen B. Moran,* 160 F.2d 502, 504–06 (2d Cir. 1947); *Hojgaard & Schultz A/S v. Transamerican S.S. Corp.,* 590 F.Supp. at 925. Although the possibility exists of recovering an amount greater than the amount originally paid, such as might be the case with a cargo of commodities whose market price has risen by the time of the damage or art objects that appreciate after purchase, *see Internatio, Inc. v. M.S. Taimyr,* 602 F.2d 49, 50–51 (2d Cir.1979), such is not the situation here.

Plaintiff of course is well aware that "[m]arket value is normally the true measure of damages." Plaintiff's Post–Trial Memorandum, p. 44. Given, however, that plaintiff paid over six times the amount for which it had just purchased the machines because it chose to thoroughly repair, recondition and replace parts, it argues for recovery of that amount, advancing a novel theory. What it contends is essentially summed up in the following two sentences of its post-trial memorandum:

> The trouble here is that there was no market value for the machines since there were no used machines available for sale except completely overhauled machines being offered by Spowage. Therefore, market value cannot be used as a determinant, as a proper measure of damages, as Nedlloyd would like this Court to believe.

*Id.* But this argument is a non sequitur. It does not follow that, if no machines were available at that time, *these* machines had no market value capable of determination. In other words, the "market price" of an undamaged similar item might well be the simple and easiest way of knowing market value, but unavailability of similar items on the market hardly means the item has "no market value." [13] Plaintiff, moreover, faces many additional problems with its unusual legal contention from the factual standpoint

because the evidence does not show that no other machines would have been available but the contrary, not only affording us a convenient basis for assessing market value but also showing that plaintiff must bear a good proportion of its own damages because it failed to act reasonably to mitigate them by seeking replacement machines or parts rather than completely restoring these machines to a condition better than when purchased.

It should be noted that even plaintiff's contention of unavailability of machines is limited to the period of October, November and December of 1986. The critical relevance of this limited time period, however, is nowhere made clear. The ships arrived and the damage uncovered in late October and early November of 1986. Surveys of the damage were done at that time and the surveyors' extensive testing and investigation continued through January 1987. It was on January 22 that the omnibus meeting of the surveyors took place at which they discussed the damage and agreed to the cost of repair and replacement to be undertaken by Jardine. The real work on the machines did not begin until some time thereafter. The true import of the October–December 1986 period of time for plaintiff would appear to be because even plaintiff must concede that "machines for sale became available in January 1987." Plaintiff's Post–Trial Memorandum, p. 43. Plaintiff says, however, that the availability of machines in January "was without plaintiff's knowledge"—which, indeed, is part of plaintiff's difficulty under the law—and further states—contrary to what the evidence showed—that "plaintiff would not have been able, using reasonable means, to ascertain their availability." *Id.*

First, plaintiff's focus on the alleged unavailability of machines during October, November and December disregards the bulk of the evidence. While plaintiff argues that "in October, November and December of 1986, plaintiff has established that there were no used, similar levers machines for sale anywhere in the world and that the first such

---

**13.** Plaintiff itself states " 'market value' itself is determined by anything which consists of 'proof' of the value of the commodity at the port of

discharge at the time of arrival of the vessel." Plaintiff's Post–Trial Memorandum, p. 48.

**712**

machines for sale became available in January, 1987," citing Tr. 288–289, 362–365, Plaintiff's Post–Trial Memorandum, pp. 42–43, the evidence does not establish this. The trial transcript at pages 288–289 is testimony of Watts that does not address the question, and at pages 362–365, Watts testified that he believed there *had* been machines available in the United States during the October–December period (although it is unclear that he can recall with exact certainty that they were available in October, November and December). While plaintiff maintains that it took the only reasonable course by undertaking the costly repair and reconditioning of the three machines because its only other option was to buy new ones from Spowage which would have been much more expensive, plaintiff did not even present evidence at trial to attempt seriously to show that no used machines were available that it could have purchased to replace these three, and the evidence it now unpersuasively cites comes only from its generally unsuccessful cross-examination of Nedlloyd's witnesses. The facts simply cannot be made to support what plaintiff would like us to believe. In addition to Watts' testimony was that of Christian Boot, a French exporter of lace production equipment who testified that "obviously there were" secondhand machines available in late 1986 or 1987 for someone in Calais to purchase. Tr. 199.

But the truth is that plaintiff did not take steps to find other machines or replacement parts at any time. Even plaintiff concedes that as of January 1987—before the repairs were undertaken—machines were available. Plaintiff simply asked Spowage what the cost of new or completely overhauled machines would be, so it must now present the contention that no secondhand ones could be found. Plaintiff's sole foray into this area appears to have been a cursory inquiry by Convie to Lecoeur at Jardine, during early discussions about the damage to the three machines, as to locating replacement machines or parts.

Lecoeur testified that Convie asked him if he knew of any machines, and Lecoeur told Convie that he was new at the job and it was an area of which he personally did not have knowledge.[14] Significantly, while the market for machines was not something in Lecoeur's field, other persons at Jardine who would have known could have been asked. Yet plaintiff did not ask Jardine, nor did it seek help in this regard from Spowage in the secondhand market for Leavers machines. Watts of Spowage knew of over a thousand Leavers machines owned by his clients throughout the world and, indeed, apart from the manufacture of new machines, Spowage was in the business of brokering or buying and selling secondhand machines. Watts, with twenty clients in Calais and another thirty-two worldwide, knew the trade and was consistently contacted by lacemakers about buying and selling secondhand machines. He testified of Leavers machines of his clients in not just France, Britain and the United States but also Japan, Italy, Spain, Mexico, Argentina, Chile, Peru, Korea and Greece. Tr. 234–35. Plaintiff, with or without Watts, could have contacted, for example, Jack Hughes, *see* Tr. 363–64, who apparently was the primary source for secondhand lace machines in America, Tr. 295–96, or George Young, who was an independent agent in the field engaged in the business of brokering such machines, *i.e.,* knowing who had them for sale and who wished to buy and bringing them together. Indeed, plaintiff did not even make an attempt to obtain such information by approaching what had been the Wilson company or approaching any of those who had in addition to plaintiff purchased machines from Wilson in 1986 even though plaintiff had purchased only less than half of those Wilson was selling. Plaintiff cannot now rely on a "head-in-the-sand" approach to the law, claiming that because it was unaware of machines available for purchase it can recover six times the amount it paid for the machines just months before they were damaged since it chose to overhaul and re-

14. Q. But from September through January, September '86 through January '87, you really didn't know the market?
A. No, I didn't.
Q. And did you tell Mr. Convie you could not find any machines?
A. He asked me if I knew. I said I didn't know, not that I couldn't find, because I didn't know how to find.
Tr. 1589.

condition them like new rather than even look for others.[15]

Apart from the evidence of actual availability of machines, it is hardly plausible, even allowing for the fact that the damaged machines were purchased during a bankruptcy, that these machines obtained for $66,000 could not be replaced by others for any amount of money less than $500,000 for any prolonged period thereafter given the huge number of such machines in existence throughout the world. Moreover and more important, as explained earlier, even if plaintiff's factual account concerning the availability of machines on the market were correct, it would not necessarily prevent a recovery based on fair market value, but instead simply make our determination of market value of these machines more difficult than it might be if an active market did not exist around the same time in which other sales from the time could be reviewed and used for that purpose. Insofar as a market did exist here at or about the same time, the evidence of witnesses and documents as to actual sales of machines as well as expert appraisals allows us to make a reliable determination of the damages to which plaintiff is entitled.[16]

Based on the testimony of Watts, Young, Hughes and Bodell, each of whom to a greater or lesser extent have knowledge of prices on the secondhand market at the relevant time and the evidence of actual sales of machines at that time, and averaging their estimates for the fair market value of Leavers lace machines similar to those damaged on board the Rosario and Rouen, Nedlloyd estimates that the fair market value at the end of 1986 would have been about $27,500 for a 9½ point machine (such as machine 9) and about $25,000 for a 10½ point machine (such as machines 18 and 19), figures which include two full sets of carriages and bobbins plus spare parts. Based on these estimates of fair market value, damages for those three machines would be $77,500, which is $8,900 greater than plaintiff's invoice total for the three machines and parts. Adding $3,287 for repair of the corrosion damage to machine 17, the sum comes to $80,787. As I find these estimates credible and consistent with the proof at trial (and because it is reasonable to presume that prices at a bankruptcy sale could be lower than normal—although one wonders about the inherent inconsistency, given the doctrine of supply and demand, in the contentions that the machines were obtained for a sum far less than one could have ever expected because of Wilson's bankruptcy yet machines for sale were allegedly so scarce that none could have been found),

---

**15.** Plaintiff might argue (although does not appear to) that the availability of machines was not as great as it appears because while Leavers machines might have been available, it would have wanted Jardine-manufactured machines as opposed to another type and, specifically, 9½ and 10½ point machines. It had originally sought machines of all of the same type so that if a part of a machine needed repair in the future, its usable parts could be interchanged with another machine and production would not have to be suspended during repair. But the apparently slight inconvenience of a temporary suspension of work on a machine that might need repair whose parts could not be interchanged with another machine (e.g., apparently one cannot use parts from a 14 point machine in a 10½ point machine), is hardly compelling enough to justify the manifold recovery plaintiff seeks. (It might be noted that prior to its purchase of the Wilson machines, not all of the machines in plaintiff's factories were of the same manufacturer and almost all were 12 and 14 point ones. Apparently 12 point machines can be adapted to interchange with 10½ point ones.) In any event, it is difficult to believe, based on the evidence, that, even if many of the available machines were not 9½ or 10½ point Jardines, that plaintiff could not have located simply *three* of that type.

**16.** Although we refer to "plaintiff" throughout, it is, of course, plaintiff's insurer who spent the money and now seeks to recover it, having decided at that time, for whatever reason, to allow plaintiff to receive the windfall of newly-reconditioned machines. It is argued here that clearly this must have been the only reasonably available course because it and the surveyors for Nedlloyd agreed to go forward in this fashion, but that is hardly the case. Damages must be measured in terms of fair market value, "not by what may have been paid to the plaintiff under an insurance contract." *Amstar Corp. v. M/V Alexandros T.*, 472 F.Supp. 1289, 1296 (D.Md.1979), aff'd, 664 F.2d 904 (4th Cir.1981) (citing *Weirton Steel Co. v. Isbrandtsen–Moller Co.*, 126 F.2d 593 (2d Cir.1942)). As Learned Hand said in the *Weirton Steel* case, "The fact that the underwriter agreed to pay the full amount claimed by [the insured] is not material; for all we know, he may have thought it worthwhile to keep the goodwill of an important customer." 126 F.2d at 595.

plaintiff shall have judgment against Nedlloyd for $80,787.[17]

### B. *Prejudgment Interest*

The allowance of prejudgment interest in admiralty is a matter committed to the trial court's discretion. However, absent "exceptional circumstances," which are not present here, it should be granted. *Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807, 823 (2d Cir.1981). *See also City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* —— U.S. ——, ——–——, 115 S.Ct. 2091, 2095–96, 132 L.Ed.2d 148 (1995); *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 372 (2d Cir.1995); *Mentor Ins. Co. v. Brannkasse,* 996 F.2d 506, 520 (2d Cir.1993); *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d at 310–11. Prejudgment interest in this case is to be calculated from the time when the cargo should have been delivered by the carrier in good condition. *See Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d at 824. The choice of interest rate and whether it is to be compounded are matters left to the court's discretion, *Mentor Ins. Co. v. Brannkasse,* 996 F.2d at 520, although it is frequently observed that the award "should be measured by interest on short-term, risk-free obligations." *Independent Bulk Transp., Inc. v. Vessel "Morania Abaco,"* 676 F.2d 23, 27 (2d Cir.1982). *See also Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d at 311; *International Ore & Fertilizer Corp. v. SGS Control Services, Inc.,* 828 F.Supp. 1098, 1104–05, 1113 (S.D.N.Y.1993), *aff'd,* 38 F.3d 1279 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995); *Nittetsu Shoji America, Inc. v. M.V. "Crystal King,"* No. 90 Civ. 2982 (KMW),

1992 WL 116430 at *131992 U.S.Dist.Lexis 7615 at *43–45 (S.D.N.Y. May 21, 1992); *M. Prusman Ltd. v. M/V Nathanel,* 684 F.Supp. 372, 374 (S.D.N.Y.1988).

In accordance with these guidelines, plaintiff is awarded prejudgment interest from October 24, 1986 on the basis of the 52–week Treasury bill rates in effect on October 24 of each year, compounded annually.[18]

### CONCLUSION

Judgment shall be entered in favor of plaintiff and against Nedlloyd for $80,787 together with prejudgment interest. All other claims of all parties shall be dismissed.

---

17. As is no doubt apparent, Nedlloyd does not argue for an award less than the full market value of the machines, thereby accepting, at least for purposes of damages, that the difference between the fair market value of machines 18, 19 and 9 in the condition in which they arrived and the condition in which they should have arrived was that value or, in other words, that the machines were "totalled." (Nedlloyd states that the machines had value "as carcasses and for spare parts," but says it will give plaintiff "the benefit of the doubt" that they were "a total loss." Nedlloyd's Amended Post–Trial Memorandum, p. 54.) And while Nedlloyd argues that repairs of

the damage could have been done for far less than plaintiff spent, it does not argue that they could have been done for less than the fair market value for the machines as assessed herein.

18. The rates are: October 24, 1986: 5.75%; October 24, 1987: 6.90%; October 24, 1988: 8.15%; October 24, 1989: 7.90%; October 24, 1990: 7.78%; October 24, 1991: 5.42%; October 24, 1992: 3.24%; October 24, 1993: 3.38%; October 24, 1994: 6.06%; October 24, 1995: 5.62%.